**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
In re:                                    :        Chapter 11
                                          :
Alcor Energy, LLC,[1]                     :        Case No. 18-12839 (___)
                                          :
                    Debtor.               :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF DON PITTS, CHIEF FINANCIAL OFFICER, IN SUPPORT OF
CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Don Pitts, hereby declare under penalty of perjury that the following is true to the best

of my knowledge, information, and belief:

1.      I am the Chief Financial Officer of Alcor Energy, LLC, a limited liability

company organized under the laws of the State of Delaware and the debtor and debtor in

possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case").  I

have served in this role since June 2018, and I am generally familiar with the Debtor's day-to-

day operations, businesses, financial affairs, and books and records.

2.      Prior to joining the Debtor, I served as the Vice President of Finance of Jacam

Chemical Company 2013 LLC ("Jacam 2013"), where I currently serve as a consultant.  During

my three and half year tenure as the Vice President of Finance, I provided all financial analysis

and financial due diligence reporting and directly aided in the negotiation of the $250,000,000

sale of Jacam Chemical Company Inc. ("Jacam Chemical") to Canadian Energy Services and

Technology Corp. (now known as CES Energy Solutions Corp.), of Calgary, Alberta, Canada.

Prior to my time at Jacam 2013, I served as the Strategic Planning Director at Jacam Chemical

---

[1]  The last four digits of the Debtor's taxpayer identification number are 0924.  The Debtor's address is 7754 East
Velocity Way, Mesa, Arizona 85212.

for six and half years.  During that time, Jacam Chemical saw an astounding 269% growth in

sales.  I also served as the President and Owner of Haldons Inc. for nearly twenty years, a

business whose principal operations consisted of converting and operating existing service

stations into convenience stores within the State of Kansas.  I earned a Bachelor of Science

degree in sociology, economics, and business administration with accounting emphasis and

minor degrees in psychology and speech from Sterling College in 1978.

        3.      I submit this declaration (this "Declaration") to provide an overview of the

Debtor, its business, and the Chapter 11 Case, as well as to support the Debtor's chapter 11

petition and the First Day Motions (as defined below).  Except as otherwise indicated herein, all

facts set forth in this Declaration are based upon my personal knowledge of the Debtor's

operations and finances, information learned from my review of relevant documents, information

supplied to me by other members of the Debtor's management and the Debtor's advisors, or my

opinion based on my experience concerning the Debtor's operations and financial condition.  I

am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I

could and would testify competently to the facts set forth herein.

        4.      As described more fully herein, the Debtor commenced the Chapter 11 Case to

effectuate a balance sheet restructuring.  Through *Alcor Energy, LLC's Small Business Plan of*

*Reorganization* (the "Plan"), which the Debtor will file, the Debtor's funded indebtedness to its

pre-petition and post-petition lender, Ocho Ventura, LLC ("Ocho"), will be cancelled and the

reorganized Debtor (the "Reorganized Debtor") will emerge as a significantly deleveraged

enterprise.  In exchange, Ocho will receive 100% of the membership interests in the Reorganized

Debtor as payment for a portion of the outstanding balance of the DIP Facility (as defined below)

01:23903147.9

and the remainder of the outstanding balance of the DIP Facility will be paid in full in deferred cash payments with interest, which terms will be set forth more fully in the Plan.

5.      The Debtor commenced the Chapter 11 Case on the date hereof (the "Petition Date") to accomplish these goals.  To minimize the adverse effects on its business of filing for chapter 11, the Debtor filed a number of motions contemporaneously herewith seeking various types of "first day" relief (collectively, the "First Day Motions").  The First Day Motions seek relief intended to allow the Debtor to perform and meet those obligations that are necessary to fulfill its duties as a debtor in possession and to continue to operate its business in the ordinary course and without interruption.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtor to operate in chapter 11 with minimum disruption, loss of productivity, or value, and that each First Day Motion constitutes a critical element in achieving a successful and expeditious reorganization of the Debtor's business and best serves the interests of the Debtor's estate, its creditors, and all parties in interest.

6.      To familiarize the Court with the Debtor and the relief the Debtor seeks on the first day of the Chapter 11 Case, this Declaration is divided into three sections.  Section I provides an overview of the formation of the Debtor, its business, and its organizational and capital structure.  Section II describes the events leading to the filing of the Chapter 11 Case. Section III summarizes the relief requested in, and the facts supporting, each of the First Day Motions.

01:23903147.9

## PART I
## COMPANY OVERVIEW

**A.**　　　　　　　**The Formation of the Debtor and Its Business Operations**

7.　　　　The Debtor was formed on May 19, 2017, in connection with a series of financial transactions with its significant stakeholders, as set forth below.

**i.**　　　　**Alcor Energy Solutions LLC and AES Oil Field Services, LLC**

8.　　　　Alcor Energy Solutions LLC ("Old Alcor"), an Arizona limited liability company, was formed on March 24, 2009.  AES Oil Field Services, LLC ("AES Oil"), an Arizona limited liability company, was formed on May 25, 2012.  Together, Old Alcor and AES Oil operated a portable turbine generator business pursuant to which generators were rented primarily to oil and gas operators in need of power in remote places that are not easily connected to conventional power grids.  This business is now operated by the Debtor.

9.　　　　Old Alcor and AES Oil's business gained the attention and interest of certain Canadian investors (the "Canadian Investors"), notwithstanding the fact that Old Alcor and AES Oil had suffered from financial difficulties for some time.  These financial difficulties stemmed in part from a dispute with Maximilian Resources LLC ("Maximilian") and its parent entity, Platinum Partners Credit Opportunities Master Fund LP ("Platinum Fund"), over the outstanding balance and performance of Old Alcor and AES Oil under that certain Loan and Security Agreement, entered into on or about May 13, 2013, as amended pursuant to that certain Amended and Restated Loan and Security Agreement dated May 8, 2014, as amended by that certain First Amendment thereto dated April 26, 2016 (the "Maximilian Loan Agreement").  The Maximilian Loan Agreement was for the benefit of AES Oil, guaranteed by Old Alcor, and secured by first liens on both companies' assets.  This dispute resulted in litigation in New York state court styled *Maximilian Resources LLC v. AES Oil Field Services, LLC, Alcor Energy*

*Solutions LLC, Barry Stonehouse and Bruce Jorgenson*, Index No. 655357/2016 (the "NY Litigation").

10.     While the NY Litigation was pending, the Canadian Investors formed an entity by the name of 1992262 Alberta Ltd. ("Alberta") as a holding company for investment efforts in Old Alcor and AES Oil.  In or about September 2016, Alberta entered into certain financing agreements with Old Alcor and AES Oil under which advances exceeding $800,000 were made to Old Alcor and AES Oil as second lien debt (the "Alberta Debt").

11.     As a result of the NY Litigation, an entity by the name of Maxus Capital Group, LLC ("Maxus") was appointed as fiscal monitor over Old Alcor and AES Oil.  Maxus's efforts as monitor alleviated some of the pressure exerted by Maximilian and Platinum Fund, but the monitoring fees charged by Maxus of approximately $20,000 a month were a further drain on the companies' resources.  Alberta began to engage with Maxus to explore solutions to resolve the NY Litigation and to gain an improved investment foothold in the power generation industry.

### ii.     The Formation of the Debtor

#### a.     The Purchase of Maximilian's Debt Position by Maxus and the Formation of the Debtor

12.     In late 2016, the Securities and Exchange Commission (the "SEC") sued Platinum Management Incorporated, LLC (the sponsor of Platinum Fund) (collectively with Platinum Fund and Maximilian, the "Platinum Parties") and its principals for various securities law violations relating to hedge fund activities, and the SEC successfully moved for the appointment of a receiver for the Platinum Parties.  Thereafter, Maxus, on behalf of Alberta, offered to buy the Old Alcor and AES Oil debt from Maximilian.  Maxus served as the point of contact with the receiver for the Platinum Parties in negotiating the loan acquisition.

13.     In the meantime, Alberta reached a deal with Old Alcor and AES Oil to form and recapitalize a new joint venture between them to operate the business once the debt was acquired and the NY Litigation was dismissed.  This resulted in the formation of the Debtor on May 19, 2017, as a Delaware limited liability company.

14.     Maxus' negotiations with Platinum Fund and Maximilian culminated in a wholly-owned special purpose subsidiary of Maxus, at the time named Maxus Capital SPV III, LLC ("Maxus SPV"), acquiring the debt position and all related collateral rights of Maximilian under the Maximilian Loan Agreement pursuant to that certain *Loan Purchase Agreement*, dated May 23, 2017 (the "Maxus Loan Purchase Agreement").  Pursuant to the Maxus Loan Purchase Agreement, the purchase price for the debt position was $3,075,000 plus a $1,000,000 promissory note (the "Maximilian Promissory Note") that had heavy discounting features: it could be paid in full for $600,000 prior to May 23, 2018 and for $800,000 if paid after May 23, 2018 but prior to maturity on November 23, 2018.  Platinum Fund and Maximilian required Maxus to guarantee the Maximilian Promissory Note.

**b.     The Acquisition of Maxus SPV's Equity by Alberta**

15.     Alberta acquired all of the outstanding equity interests of Maxus SPV from Maxus for $3,075,000 pursuant to that certain *Limited Liability Company Interest Purchase Agreement*, dated May 23, 2017.  Maxus SPV's name was subsequently changed to Ocho Ventura, LLC (as previously indicated, "Ocho") pursuant to that certain *Consent of the Sole Member of Maxus Capital SPV III, LLC*, dated May 31, 2017, and a related amendment of its Certificate of Formation.  As part of this transaction, Maxus also required the following security for its guaranty of the Maximilian Promissory Note:  (a) a $300,000 payment from the Debtor and (b) a $700,000 promissory note (the "Maxus Promissory Note") from the Debtor with

comparable discount provisions to the Maximilian Promissory Note.  The Maxus Promissory

Note was secured by a second lien on the Debtor's assets and by a non-recourse pledge by Ocho

and Old Alcor of their respective membership interests in the Debtor.

### c.  The Capitalization and Organizational Structure of the Debtor

16.    On May 23, 2017, Old Alcor, AES Oil, certain of the members of Old Alcor and

AES Oil, Ocho, and the Debtor entered into that certain *Contribution Agreement*, dated May 23,

2017 (the "Contribution Agreement"), pursuant to which the Debtor was capitalized.  Pursuant to

the Contribution Agreement, based on information disclosed and representations made at the

time, the parties thereto agreed that the Debtor had an enterprise value of $10,000,000.  After

subtracting outstanding debt to be assumed by the Debtor of $5,275,000 (comprised of (a) the

outstanding balance on the first lien debt acquired by Ocho from Maximilian, equal to

$4,075,000, (b) the remaining outstanding balance of the Alberta Debt, equal to $800,000, and

(c) a separate unsecured $400,000 obligation to Barry Stonehouse, a principal owner of Old

Alcor, for prior advances to Old Alcor), the parties arrived at a net equity valuation of the Debtor

equal to $4,725,000.  Old Alcor and AES Oil contributed all of their business assets, subject to

those expressly identified debt liabilities, to the newly formed Debtor.  Ocho then committed to

contribute an equivalent $4,725,000 in equity to the Debtor over time, as needed.  The first

$800,000 of equity contribution by Ocho took the form of converting the existing Alberta Debt

from debt to equity.  Ocho and Old Alcor each received 50% of the equity interests in the

Debtor, and AES Oil's interest was rolled into Old Alcor's interest due to the commonality of

membership between those two entities.

17.    At closing, there was not sufficient working capital in the business to fund the

$300,000 payment to Maxus as security for its guaranty of the Maximilian Promissory Note.

Accordingly, Alberta funded $150,000 and Bruce Jorgenson (a member of Old Alcor) funded the other $150,000, and each received unsecured promissory notes from the Debtor for these advances, as described more fully in Section II.B. below.  As a result of these payments and the Maxus Promissory Note delivered by the Debtor in the amount of $700,000, the senior lien debt balance was reduced by $1,000,000 to $3,075,000.

18.     Upon the formation of the Debtor, Wiley Zimmerman, Randall Smith, and Barry Stonehouse were appointed as the Debtor's limited liability company managers.

**d.     The Purchase of the Maxus Promissory Note by Ocho**

19.     The Maxus Promissory Note could have been paid in full on or before November 23, 2017 for $600,000 (*i.e.*, an amount sufficient for Maxus, in its capacity as guarantor, to then take advantage of the $100,000 discount on the Maximilian Promissory Note). However, due to disagreements between Ocho's representatives and Old Alcor's representative on the Debtor's board of managers regarding possible funding alternatives, the Debtor was unable to take advantage of the discount on the Maxus Promissory Note.  Thereafter, Maxus began to assert various inspection and other rights against the Debtor, and eventually Maxus and Ocho reached an agreement in May 2018 whereby Ocho bought the Maxus Promissory Note and related security and, as a result, increased its secured position vis-a-vis the Debtor by $700,000.

**B.         Capital Structure**

20.     As of the Petition Date, as described above and set forth below, Alcor had the following outstanding debt obligations:

**i.     Secured Debt**

**a.     Ocho Promissory Note**.  Pursuant to that certain *Amended and Restated Promissory Note*, dated May 23, 2017 (the "Ocho Promissory Note"), the Debtor agreed to pay Maxus SPV, now known as Ocho, the principal sum of $3,075,000,

bearing interest at the rate of 10.00% per annum.  The current amount of outstanding interest is $117,875.  Ocho has also made advances and incurred expenses to protect and preserve the value of the collateral defined and described in Section 2.2 of the Maximilian Loan Agreement, as further discussed below, the proceeds of which were used to fund the Debtor's professional fees and working capital needs necessary to enable the Borrower to prepare for an orderly commencement of the Chapter 11 Case.

            **b.**      **Maxus Promissory Note.**  Under the Maxus Promissory Note now held by Ocho, the Debtor agreed to pay the principal sum of $700,000, bearing interest at a rate of 1% per month from and after its maturity on November 23, 2018.  The current amount of outstanding interest is $5,833.

            **ii.**      **Unsecured Debt**

            **a.**      **Alberta Promissory Note.**  Pursuant to that certain *Promissory Note* dated May 23, 2017, the Debtor agreed to pay Alberta the principal sum of $150,000, bearing interest at the rate of 10.00% per annum, which principal balance reflected an advance of $150,000 made by Alberta to the Debtor on May 23, 2017.  The current amount of outstanding interest is $5,750.

            **b.**      **Jorgenson Promissory Note.**  Pursuant to that certain *Promissory Note* dated May 23, 2017, the Debtor agreed to pay Mr. Bruce Jorgenson the principal sum of $150,000, bearing interest at the rate of 10.00% per annum, which principal balance reflected an advance of $150,000 made by Mr. Jorgenson to the Debtor on May 23, 2017.  This advance, together with the advance made by Alberta, was used to make the $300,000 payment to Maxus described above.  The current amount of outstanding interest is $5,750.

c.    **Stonehouse Promissory Note.**  Pursuant to that certain

*Promissory Note* dated May 23, 2017, the Debtor agreed to pay Mr. Barry Stonehouse the

principal sum of $400,000, bearing interest at the rate of 10.00% per annum, which

principal balance reflected $400,000 in preexisting indebtedness owed to Mr. Stonehouse

by Old Alcor and/or AES Oil, which indebtedness was assumed by the Debtor. The

outstanding principal balance of this promissory note to Mr. Stonehouse is $400,000, and

the current amount of outstanding interest is $15,333.

d.    **Alberta Other Unsecured Debt.**  Alberta is owed funds for

unpaid consulting fees and related expenses relating to the services of the Debtor's

principal executive officer, Mr. Zimmerman.  The consulting fees currently outstanding

are $69,000, and the unreimbursed out-of-pocket expenses are $52,814, for a total of

$121,814.

e.    **Contingent Liabilities.**  The Debtor is presently a defendant in

two separate lawsuits.  While the Debtor disputes liability under the theories advanced by

the opposing parties in those cases, its arguments may not be successful.  One of these

lawsuits is the Mesa Green litigation discussed below in Part II, in which the plaintiff

seeks to collect a minimum of $600,000 from the Debtor.  In the other case, an

interpleader action pending in the District Court of the Fort Berthold Indian Reservation

in North Dakota, a third party by the name of Trustland Oilfield Services, LLC

("Trustland"), claims it is entitled to $165,462 for services provided as an agent of the

Debtor, to be paid out of a receivable owed to the Debtor from Bruin E&P Operating,

LLC ("Bruin") in the amount of $192,522.  The Debtor is attempting to collect the

receivable owed by Bruin but disputes that Trustland performed any services as agent of

the Debtor and that Trustland is entitled to any payment from the Debtor, whether out of this receivable or otherwise.

      **f.**      **Other Unsecured Debt.**  As set forth in the Debtor's top 20 list of unsecured creditors, the Debtor also owes certain amounts to third parties related to trade debt, rent, truck rentals, and professional fees.  The aggregate amount of such debt, excluding the contingent litigation liabilities discussed above, is approximately $621,000.

## PART II
## KEY EVENTS LEADING TO THE CHAPTER 11 CASE

21.     Shortly following the formation of the Debtor, several events led to the deterioration of the Debtor's business performance, including (i)  litigation claims, (ii)  quality control of products and services offered by the business, (iii)  higher than expected operational and manufacturing costs and unprofitable customer contracts, (iv) the deferred maintenance of equipment, and (v) customer dissatisfaction.  The relationship between Ocho and the Canadian Investors, on the one hand, and Old Alcor and its principal, Mr. Stonehouse, on the other hand, became strained and further contributed to problems at the Debtor.

22.     <u>Litigation</u>.  First, approximately two (2) months after the formation of the Debtor, it was served with a subpoena by Mesa Green Electric Power Phase I, LLC ("<u>Mesa Green</u>"). Upon investigating the lawsuit in which the subpoena was issued, the Debtor's management discovered that Old Alcor had been a party to a pending arbitration with Mesa Green at the time of the closing that had been ongoing for at least a year.  An arbitration award in the amount of $600,000 had been issued in favor of Mesa Green, which arbitration award was reduced to judgment after closing of the Debtor's formation transactions previously described.  The subpoena asked for information relevant to a successor liability claim against the Debtor.  Mesa Green subsequently sued for and obtained a charging order on Old Alcor's membership interest

in the Debtor and has also sued the Debtor, Old Alcor, and Old Alcor's principals for fraudulent transfer theories.

23.     As the balance of 2017 unfolded, the Debtor periodically received notice of other similar claims involving Old Alcor's principals and management.  As a result of these claims, there have been additional threats of litigation against the Debtor that have not yet materialized.

24.     <u>Customer Dissatisfaction and Poor Business Performance</u>.  Over time, the Canadian Investors, Ocho, and Alberta realized that the Debtor's product quality did not meet industry standards.  Moreover, manufacturing and operational issues, unrealistic promises to customers, unprofitability of certain customer contracts, and conflict between members of the Debtor's management team all resulted in problems that were not anticipated at the time of the Debtor's formation, and the Debtor was plagued with customer dissatisfaction.  In addition to the lawsuit noted above pertaining to successor liability, there have been four (4) different lawsuits with two different customers (two actions each, based on forum selection arguments) asserting breach of contract claims by the customers and collection claims by the Debtor.

25.     <u>The Management of the Debtor</u>.  In September of 2018, Ocho hit its maximum capital commitment to the Debtor.  Ocho's representatives on the Debtor's board of managers made several attempts to address and rectify the Debtor's financial and funding difficulties but were unable to come to an agreement with Old Alcor's representative on the Debtor's board of managers. Over time, the relationship between the various representatives worsened, leading Mr. Stonehouse to resign from his position as manager effective July 31, 2018.  He left his position as the Debtor's Chief Operations Officer effective August 31, 2018.

26.     Old Alcor appointed Syau-fu Ma as its replacement representative on the Debtor's board of managers following Mr. Stonehouse's resignation.  Ms. Ma and Ocho's designated

managers on the Debtor's board similarly have been unable to reach an agreement to address the Debtor's funding needs.

27.     To obtain an independent perspective relating to the Debtor's financial condition, the Debtor engaged Neil Gilmour III to serve as an independent manager on December 6, 2018 and began sharing relevant financial information with Mr. Gilmour at that time.  On December 14, 2018, to formally add Mr. Gilmour to the Debtor's board of managers, Ocho appointed Mr. Gilmour to replace Mr. Zimmerman as a manager of the Debtor.  Mr. Gilmour has extensive experience counseling companies through financial and operational turnarounds and other financial, consulting, and bankruptcy assignments.  Since his engagement, Mr. Gilmour has become knowledgeable and familiar with the Debtor's business and financial affairs and the facts and circumstances leading up to the commencement of the Chapter 11 Case.  Mr. Gilmour joined with Mr. Smith to authorize the Debtor to commence the Chapter 11 Case.

## PART III
## FIRST DAY MOTIONS

28.     Contemporaneously herewith, the Debtor filed a number of First Day Motions seeking targeted relief intended to allow the Debtor to minimize the adverse effects of the commencement of the Chapter 11 Case on its ongoing business operations.  The First Day Motions seek authority to, among other things, enter into the DIP Facility, including to obtain the borrowings thereunder, to pay prepetition wages and employee benefit and taxes, honor their obligations with certain essential utility providers and insurance companies, maintain the Debtor's current cash management system, and ensure the continuation of the Debtor's business operations without interruption.  Court approval of the relief requested in the First Day Motions is necessary to ensure the ongoing and smooth operations of the Debtor while the balance sheet restructuring is implemented through the Chapter 11 Case.

01:23903147.9

29.    The First Day Motions in the Chapter 11 Case are:

- Debtor's Motion for Order Authorizing Debtor to (I) Pay Certain Prepetition Wages, Other Compensation, and Reimbursable Expenses and (II) Continue Employee Benefit Programs;

- Debtor's Motion for Order Authorizing (I) Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Liability, Property, and Other Insurance Programs, Including Payment of Policy Premiums and (II) Continuation of Insurance Premium Financing Program;

- Debtor's Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105(a), 345, 363(c), and 503(b), Bankruptcy Rules 6003 and 6004, and Local Rule 2015-2 (I) Authorizing Continued Maintenance of Prepetition Bank Accounts and Payment of Related Prepetition Obligations, (II) Authorizing Continued Use of Existing Cash Management System, and (III) Authorizing Continued Use of Existing Business Forms;

- Debtor's Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a) and 366 (I) Approving Debtor's Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Additional Adequate Assurance Requests, and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and

- Motion for Interim and Final Orders (A) Authorizing the Debtor to Use Cash Collateral, (B) Authorizing the Debtor to Obtain Post-Petition Financing, (C) Granting Superpriority Security Interests and Superpriority Administrative Expense Status to Existing Lender, (D) Granting Adequate Protection to First Lien Lender, (E) Scheduling a Final Hearing, and (F) Granting Related Relief (the "DIP Motion").

30.    I have reviewed each of the First Day Motions.  The facts and descriptions of the relief requested therein are detailed below and are true and correct to the best of my information and belief.

31.    I believe that the relief sought in each of the First Day Motions is necessary to: (i) enable the Debtor to continue its operations in the ordinary course with minimal disruption and (ii) minimize any loss of the Debtor's value.  Further, I believe that if the Court grants the relief requested in the First Day Motions, the prospect of achieving these objectives—to the

maximum benefit of the Debtor's estates, creditors, and other parties in interest—will be substantially enhanced.  Accordingly, I believe that the Court should grant each of the First Day Motions.

32.     Regarding the DIP Motion[2] in particular, the ability of the Debtor to maximize the value of its estate depends upon the Debtor's ability to use the Cash Collateral of Ocho as well as the post-petition loan Ocho is willing to make to the Debtor (the "<u>DIP Facility</u>").  Without the use of Cash Collateral and the DIP Facility, the Debtor will not have the funds necessary to conduct its business, maintain its assets, sell or otherwise liquidate its assets, provide financial information, or pay employee compensation, payroll taxes, overhead, and other expenses necessary to maximize the value of the Debtor's estate.  Ocho is willing to provide the DIP Facility to or for the benefit of the Debtor only in accordance with the terms of the Term Sheet and the Interim and Final Orders approving the DIP Facility (the "<u>Financing Orders</u>").

33.     In my opinion, the Debtor and Ocho have negotiated and agreed in good faith to the terms and conditions of the DIP Facility and the Financing Orders.

34.     The use of Cash Collateral by the Debtor and entry into the DIP Facility is necessary to preserve the Debtor's estate, and the relief hereunder is necessary to avoid immediate and irreparable harm to the Debtor's estate. The Debtor requires the use of Cash Collateral as provided herein.

35.     The Debtor has requested and Ocho has agreed to provide use of Cash Collateral and the DIP Facility to provide funds to be used for the purposes set forth in the Budget, and such other purposes as permitted by the Financing Orders and the Term Sheet to which Ocho consents in writing.

---

[2] Capitalized terms used but not otherwise defined in this section shall have the meanings ascribed to such terms in the DIP Motion, filed contemporaneously herewith.

36.    The Debtor has sought to obtain financing from other sources and is unable to obtain credit allowable under section 503(b)(1) of the Bankruptcy Code, or pursuant to sections 364(a) and (b) of the Bankruptcy Code, on terms more favorable to the Debtor than the terms of the DIP Facility.  The terms of the DIP Facility and the Financing Orders, including, without limitation, the related fees and priming liens granted in accordance therewith, are fair, just, and reasonable under the circumstances, are ordinary and appropriate for secured financing to debtor-in-possession, reflect the Debtor's exercise of its prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  In my opinion any credit extended under the terms of the Financing Orders and the DIP Facility should be treated as being extended in good faith by Ocho, and Ocho should be entitled to all protections afforded thereunder, including, without limitation, the full protection of section 364(e) of the Bankruptcy Code.

37.    On or about September 1, 2018, the Debtor had exhausted all of its available cash and was unable to obtain capital contributions by means of a capital call.  As a result the Debtor was left without any option to fund its operations or otherwise continue in operation.   As a means to avoid the loss of value of its collateral, including the going concern value of the Debtor's business, Ocho, in lieu of charging and accruing its interest at the default rate and to otherwise preserve the going concern value of its Collateral, advanced funds for payroll, other working capital needs, and expenses to prepare for this chapter 11 filing.  Part of the DIP Facility will be used to reimburse Ocho for such funds as a fair and reasonable treatment of Ocho's first priority claims as well as for the DIP Facility.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed:        December 19, 2018

                                        */s/ Don Pitts*
                                        Name:    Don Pitts
                                        Title:      Chief Financial Officer of Alcor
                                                      Energy, LLC